1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                     SOUTHERN DISTRICT OF CALIFORNIA

10

11  ALFREDERICK LOVE,                )   Civil No. 06cv640 WQH(RBB)
                                     )
12              Petitioner,          )   **REPORT AND RECOMMENDATION**
                                     )   **GRANTING PETITION FOR WRIT OF**
13  v.                               )   **HABEAS CORPUS [DOC. NO. 1] AND**
                                     )   **ORDER GRANTING RESPONDENT'S**
14  L.E. SCRIBNER, Warden,           )   **MOTION TO STRIKE EXHIBIT B**
                                     )
15              Respondent.          )
    _____    )

16

17                          **INTRODUCTION**

18       Alfrederick Love, an African-American, was tried and convicted

19  of battery on a non-confined person by a prisoner.  During the

20  second day of jury selection, Monday, July 21, 2003, Assistant

21  District Attorney Eric Baker excused the lone African-American from

22  the jury.  His motivation for that peremptory challenge is the

23  subject of this proceeding.

24                          **I.   BACKGROUND**

25       **A.   The Jury Selection**

26       On December 4, 2002, the Imperial County District Attorney

27  filed an information charging Alfrederick Love with two counts of

28  battery on a non-confined person by a prisoner in violation of

                               1

California Penal Code section 4501.5 for his attacks against

Sergeant Kenneth Grady and Correctional Officer B. Walker.

(Lodgment No. 1, Clerk's Tr. vol. 1, 001C-002, Dec. 4, 2002.)  The

information also alleged the following sentencing enhancements:

(1) Petitioner committed the charged batteries while confined in

state prison within the meaning of California Penal Code section

1170.1(c), and (2) Love had three prior serious or violent felony

convictions for robbery that would result in sentencing

enhancements under California Penal Code sections 667(b)-(i) and

1170.12(a)-(d).  (Id.); see also Cal. Penal Code § 211 (West 2008).

### 1.   Jury Selection -- Day One

Jury selection began on July 17, 2003.  Love represented

himself during the jury selection process and at trial.  (J. Mot.

File Tr. State Proceedings, Attach. #1 Tr. 134, 216, July 17,

2003.)  On the first day of the selection process, Assistant

District Attorney Christopher Kowalski represented the People of

California.  (Id.)  The Honorable Jeffrey B. Jones excused or

deferred service for all the potential jurors with qualifying

hardships.  (Id. at 170-73.)  He then questioned the twenty-four

remaining potential jurors.  (Id. at 173-201.)  Among them were

Sahid Ramirez, later struck by Prosecutor Baker, and juror four,

one of the jurors who is the subject of this Court's comparative

analysis.[1]  (Id. at 172.)

Ramirez told the trial court he was from Calexico; he was

married with a young baby; he worked at the "[S]ocial [S]ecurity

_____

[1]   The trial court transcript refers to some jurors by name
and others by number, presumably to protect the privacy of those
making that request.  This Court will use the same identifying
information here.

1   office;" his wife was a tutor at an elementary school; and he had
2   no prior jury experience.  (Id. at 176.)  Juror four stated her
3   residence and explained that she was married with three children
4   and one grandchild; she was "an instructional assistant;" her
5   husband was a maintenance worker; and she had no prior jury
6   experience.  (Id.)  Other prospective jurors disclosed similar
7   background information and responded to questions from the court.
8   (Id. at 176-201.)

9       Next, Assistant District Attorney Kowalski and Love questioned
10  the potential jurors.  (Id. at 201-252.)  Neither directed any
11  questions to Ramirez or juror four.  (Id.)  Following questioning,
12  the prosecutor and Love each challenged certain prospective jurors
13  for cause, and the trial judge excused five individuals from the
14  jury panel.  (Id. at 252-60.)  After vacancies in the jury box were
15  filled, Kowalski and Love were permitted to make peremptory
16  challenges to the first twelve potential jurors.  (Id. at 260-63.)
17  Kowalski exercised four peremptory challenges, and Love exercised
18  three; the court excused each challenged juror.  (Id.)

19      Judge Jones drew nine additional names.  (Id. at 263-65.)  He
20  then conducted the court's voir dire of the new potential jurors.
21  (Id. at 266-77.)  Gloria McGee, the focal point of Love's Batson
22  challenge, was among this group.  (Id. at 264.)  She was married,
23  had three children, was an eligibility worker, and had no prior
24  jury experience.  (Id. at 266.)  Her husband was a retired
25  electrician.  (Id. at 268.)  In addition, she disclosed that her
26  brother-in-law was a correctional officer at Calipatria State
27  Prison, and her sister was a supervisor in the records section of
28  the sheriff's department.  (Id. at 275.)

Kowalski and Love questioned the nine new potential jurors. (<u>Id.</u> at 277-94.)  The prosecutor asked McGee questions about her contacts and conversations with her sister and brother-in-law. (<u>Id.</u> at 291-93.)

Following the questioning, the judge excused two individuals from the group of nine for cause.  (<u>Id.</u> at 296.)  Next, Kowalski and Love each exercised three peremptory challenges, and the court excused the challenged jurors.  (<u>Id.</u> at 296-98.)  Their vacancies were filled from the group of nine potential jurors outside the jury box.  (<u>Id.</u>)  McGee moved to seat number one.  (<u>Id.</u> at 298.) This concluded the first day of voir dire.  (<u>Id.</u> at 297-98.)

### 2.   Jury Selection -- Day Two

When the trial resumed the following Monday, July 21, 2003, Kowalski was unavailable due to illness, and attorney Gordon Goodman appeared for the People of California.  (<u>Id.</u> Attach. #2 Tr. 304, 307, July 21, 2003.)  An additional group of potential jurors was brought to the courtroom.  (<u>Id.</u> at 310.)  Judge Jones excused or deferred service for those individuals with qualifying hardships.  (<u>Id.</u> at 337-41.)

After a recess, Assistant District Attorney Eric Baker, the prosecutor whose actions are the subject of Love's <u>Batson</u> challenge, entered the courtroom.  (<u>Id.</u> at 347.)  He stated that he had been assigned to the case and was prepared to proceed.  (<u>Id.</u>) At that point, Goodman was excused.  (<u>Id.</u> at 348.)  The judge explained that there were twelve potential jurors in the jury box who had been questioned during the first day of voir dire.  (<u>Id.</u> at 347-48.)  The court called another twelve individuals to fill the seats outside the jury box.  (<u>Id.</u> at 348.)

Judge Jones then conducted the court's voir dire of the twelve additional potential jurors. (Id. at 349-63.) Among this group of twelve were jurors eight and ten, Denise Garibay, Karl Noris, and alternate number one. (Id. at 348-49.)

Juror eight stated her city of residence and explained that she was married with three children and one grandchild. (Id. at 352.) She was employed as a "teacher's aide;" her husband was retired from his job as a cowboy in a feed lot; and she had served on a jury approximately ten to twelve years earlier but could not remember if it was in a civil or criminal case. (Id.) Juror ten was a Holtville resident; she was not married, had one child, and was a "school teacher." (Id. at 351.) Her ex-husband was a farmer, and she served on a criminal case about fifteen years earlier. (Id.)

Garibay lived in El Centro, was divorced, had two children, was a teacher for "Imperial County Office of Education[,]" and her ex-husband worked for a tire repair service. (Id. at 353.) Noris lived in El Centro, had no children, was single, went to Imperial College, and had no prior jury experience. (Id.) Alternate number one stated her residence and explained that she was married with a daughter, "work[ed] at Jefferson El Centro School[,]" and her husband worked for the family tire service. (Id. at 353-54.)

After the court's questioning was completed, the trial judge told Baker he had twenty minutes to question the jurors. (Id. at 363-64.) Baker had the notes that Kowalski had taken about the jurors. (Tr. Evidentiary Hr'g 17, Mar. 12, 2009.) They contained the jurors' occupations, but "not all the jurors had the same amount of notes written on them." (Id.) The only information

Baker recalled about McGee from the notes was that she was an eligibility worker, which he would characterize as a social worker. (Id. at 22-23, 25.)

Prosecutor Baker asked the potential jurors generally about any personal contacts with law enforcement; could they hold a pro se defendant to the same standard as the prosecution, and could they base their decision on the evidence in this case. (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 364-66.) He asked one juror if he would be able to vote guilty if the prosecution proved its case beyond a reasonable doubt. (Id. at 366.) Baker asked if anyone felt uncomfortable because the case involved an incident that occurred in state prison and whether there were any other reasons they did not want to sit on the jury that they had not already shared. (Id.) Love did not ask any questions. (Id.)

Next, Baker and Love conferred with the judge in chambers, and Love made one challenge for cause that the judge granted. (Id. at 366-67.) Judge Jones then explained they would resume peremptory challenges once they returned to the courtroom. (Id.) Baker asked whether the individuals in the jury box had been challenged yet. (Id.) The judge responded that each party could make peremptory challenges of the jurors seated in the jury box. (Id. at 367-68.) The prosecution had already exercised seven peremptory challenges, and Love had exercised six; Baker would be the first to exercise a challenge. (Id. at 368.) Before reentering the courtroom, Baker asked whether it was a "life case," to which the judge responded that there was a possible "20 indeterminate life sentence." (Id.)

After the trial judge excused one individual for cause, Baker began his peremptory challenges. (Id.) His first challenge was to

6

McGee, the only African-American potential juror. (<u>Id.</u> at 369,
371.)  Love exercised a peremptory challenge, and then Baker
excused Ramirez, the individual who worked at the Social Security
office.  (<u>Id.</u> at 369.)  Next, Love excused Lovecchino, a high
school special education teacher.  (<u>Id.</u> at 351, 369.)  The
prosecutor exercised another peremptory strike, followed by Love,
and then Baker exercised a fourth strike.  (<u>Id.</u> at 370.)  Both
Baker and Love indicated they had no other peremptory challenges.
(<u>Id.</u>)

     Before the jurors were sworn, Love asked for a side-bar
conference to address the court.  (<u>Id.</u> at 371.)  He made a
"<u>Wheeler/Batson</u>" objection to Baker's dismissal of McGee, the only
African-American on the jury panel.[2]  (<u>Id.</u>)  The court sought a
response from the prosecutor, and Baker offered the following
explanation:

> . . . I would offer as my reason is that she's a social
> worker and eligibility worker.  I excused both of those
> that I believed to be that.  That is a personal -- my
> personal jury selection.  Teachers and social workers
> don't sit on the jury.  I referred to Chris Kowalski's
> notes who was in original voir dire.  It appears she
> was an eligibility worker.  They are not favorable
> jurors to the prosecution.

(<u>Id.</u> at 371-72.)

     Love countered:

---

[2]   In <u>People v. Wheeler</u>, 22 Cal. 3d 258, 276-77, 583 P.2d 748,
761-62, 148 Cal. Rptr. 890, 903 (1978), the California Supreme
Court held that the prosecution's use of peremptory challenges to
eliminate jurors on the basis of "group bias," including challenges
on the basis of membership in a certain racial group, violates the
California Constitution.  Similarly, the United States Supreme
Court, in <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986), held that the
prosecution's use of peremptory challenges to eliminate African-
Americans from the jury pool violates the Equal Protection Clause.

> From my notes, she's not a teacher and social worker. The only thing about her background has been law enforcement, which makes it seem -- conventionally she would be leaning towards the District Attorney. The only thing I can see that you would possibly dismiss her for is that she's African/American.

(<u>Id.</u> at 372.)

The court overruled Love's objection.

> I'll deny the motion on the following basis. First of all, to my knowledge -- and I believe this is correct of the entire groups we've brought in, which would have been a total of about -- I'm going to say 155, 160 people -- Ms. McGee was the only African/American.
>
> . . . .
>
> I think she's the only one that remained after hardships. I don't think there was anybody left.
>
> . . . .
>
> And so the People's exercise of peremptory challenge as to the only African/American juror in the entire available panel I don't think shows a pattern which is required. It's one peremptory out of many. And I do find that the reason offered by Mr. Baker for the exercise of the challenge is a -- although not a challenge-for-cause reason, it establishes there was not a discriminatory motive based upon her membership of the protective class.
>
> I'll deny the motion, Mr. Love. But I think you've made your record.

(<u>Id.</u> at 372-73.)  Love asked, "Did he indicate that he had removed all teachers and social workers?"  (<u>Id.</u> at 373.)  Judge Jones responded, "He indicated that was the reason for removing Ms. McGee."  (<u>Id.</u>)

The jury was sworn in, and the judge decided there should be one alternate.  (<u>Id.</u> at 374.)  Each party had one peremptory challenge to the alternate.  (<u>Id.</u>)  The next three jurors were Garibay, a teacher; Noris, an unmarried student; and alternate

8

number one, who stated she worked at a local school.  (Id. at 374-75.)  Baker passed, and Love exercised his peremptory challenge on Garibay.  (Id. at 375-76.)  The prosecutor then exercised his peremptory challenge on Noris.  (Id. at 375.)  Thus, the remaining person became the alternate.  (Id.)  Jury selection was completed, and the remaining potential jurors were excused.  (Id. at 375-76.)

**B.    The Subsequent Procedural History**

On July 28, 2003, the jury convicted Petitioner of battery on Sergeant Grady but acquitted him of battery on Officer Walker. (Lodgment No. 1, Clerk's Tr. vol. 2, 361-62, July 28, 2003.)  The jurors found the allegations of three prior felony convictions were true.  (Id. at 365.)

Petitioner filed a motion for new trial on August 11, 2003. (Id. at 377, Aug. 11, 2003.)  One of the bases of Love's motion was the trial court's denial of his Wheeler/Batson motion to set aside the prosecutor's peremptory challenge of McGee.  (Id. at 389-90); see Batson v. Kentucky, 476 U.S. at 89; People v. Wheeler, 22 Cal. 3d at 276-77, 583 P.2d at 761-62, 148 Cal. Rptr. at 903.   In addition, Petitioner moved to strike his prior convictions. (Lodgment No. 1, Clerk's Tr. vol. 2, 370.)

The trial judge denied Love's motions.  (Id. at 415.)  The court sentenced Petitioner, a confined inmate, to twenty-five years to life in prison, which was to run consecutively to the term he was already serving.  (Id.)  Love was also ordered to pay a restitution fine of $200 pursuant to California Penal Code section 1202.4(b).  (Id.)

Petitioner filed an appeal, arguing that the denial of his Wheeler motion was in error and required reversal.  (Lodgment No.

2, Appellant's Opening Brief at 8, <u>People v. Love</u>, No. D043053 (Cal. Ct. App. Feb. 2, 2005).)  The California Court of Appeal affirmed Love's conviction on February 2, 2005.  (Lodgment No. 5, <u>People v. Love</u>, No. D043053, slip op. at 1, 9 (Cal. Ct. App. Feb. 2, 2005).)

Petitioner filed a petition for review in the California Supreme Court, raising the same <u>Wheeler/Batson</u> argument regarding the prosecutor's alleged impermissible use of a peremptory challenge.  (Lodgment No. 6, Petition for Review at 3, <u>People v. Love</u>, No. S132156 (Cal. Apr. 13, 2005).)  The court summarily denied Love's petition on April 13, 2005.  (Lodgment No. 7, <u>People v. Love</u>, No. S132156, order at 1 (Cal. Apr. 13, 2005).)

On March 22, 2006, Love, proceeding pro se and in forma pauperis, filed a federal Petition for Writ of Habeas Corpus [doc. no. 1].  Petitioner alleged one claim for relief:  Assistant District Attorney Baker's use of a peremptory challenge to exclude "all black jurors from the seated panel" and the trial court's denial of Love's motion to set aside the peremptory challenge of the only African-American juror, McGee, resulted in a violation of Petitioner's right to equal protection under the Fourteenth Amendment.  (Pet. 5.)

This Court issued a Report and Recommendation Re:  Denying Petition for Writ of Habeas Corpus and Order Denying Request for Evidentiary Hearing on September 7, 2006 [doc. no. 11].  Love timely filed an objection [doc. no. 12].  United States District Judge William Q. Hayes adopted the Report and Recommendation and entered judgment in favor of Respondent on January 19, 2007 [doc.

no. 15].   Judge Hayes granted Petitioner's request for a

certificate of appealability on February 14, 2007 [doc. no. 18].

     The Ninth Circuit, on March 19, 2008, reversed the judgment

and remanded the case for an evidentiary hearing to determine

whether the prosecution struck McGee on the basis of her race [doc.

no. 25].   The circuit court held that the California Court of

Appeal unreasonably applied clearly established federal law, so

"the inquiry into whether the prosecutor's reason for rejecting the

black juror was pretextual must be determined de novo on federal

habeas."  Love v. Scribner, 278 F. App'x 714, 718 (9th Cir. 2008)

(quoting 28 U.S.C. § 2254(d)(1) (citing Frantz v. Hazey, 522 F.3d

724, 739 (9th Cir. 2008) (en banc)).

     This Court appointed counsel for Petitioner [doc. no. 29].

Prehearing conferences with counsel for Love and Respondent were

held on October 21 and November 18, 2008 [doc. nos. 33, 34]; the

evidentiary hearing was set for December 2, 2008, but continued to

March 12, 2009 [doc. nos. 33, 34, 37, 38].   The evidentiary hearing

was held on that date [doc. no. 43].   Two witnesses testified at

the hearing:  Eric Baker, a former deputy district attorney in the

Imperial County District Attorney's Office, and Love, the African-

American Petitioner.   (Tr. Evidentiary Hr'g 1-3, 82.)

     The parties jointly filed a copy of the transcript of the

superior court jury selection proceedings [doc. no. 45].   On April

28, 2009, Respondent submitted his Post-Evidentiary Hearing Opening

Brief [doc. no. 46].   Petitioner filed a Post-Hearing Legal Brief

[doc. no. 48].   Attached as Exhibit B to the brief is a copy of the

transcript of a prehearing interview of Eric Baker.   (Pet'r's Post-

Hr'g Br. Ex. B.)   Respondent's Post-Evidentiary Hearing Reply Brief

was submitted on May 29, 2009 [doc. no. 49].  The brief also contains a request to strike Exhibit B to Petitioner's Post-Evidentiary Hearing Brief.  (Resp't's Post-Evidentiary Hr'g Br. 1.)  Love filed an Opposition to Motion to Strike and Surreply to Post-Hearing Briefing [doc. no. 50].

On July 7, 2009, the Ninth Circuit decided <u>Ali v. Hickman</u>, 571 F.3d 902 (9th Cir.), <u>amended</u> <u>by</u> 2009 WL 3401452 (9th Cir. Oct. 23, 2009), a case discussing a <u>Batson</u> challenge to a state court conviction [doc. no. 52].  Petitioner and Respondent each filed supplemental briefs addressing <u>Ali</u> [doc. nos. 53, 54].

## II.   THE SCOPE OF THIS PROCEEDING

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C.A. § 2244 (West Supp. 2008), applies to all federal habeas petitions filed after April 24, 1996.  <u>Woodford v. Garceau</u>, 538 U.S. 202, 204 (2003) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997)).  AEDPA sets forth the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006); <u>see also</u> <u>Reed v. Farley</u>, 512 U.S. 339, 347 (1994); <u>Hernandez v. Ylst</u>, 930 F.2d 714, 719 (9th Cir. 1991).  Because Love's Petition was filed on March 22, 2006, AEDPA applies to this case.  <u>See</u> <u>Woodford</u>, 538 U.S. at 204.

Amended § 2254(d) reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court
proceedings unless the adjudication of the     claim --

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application of,
> clearly established Federal law, as determined
> by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

28 U.S.C.A. § 2254(d).

On remand from the Ninth Circuit, this Court must now
determine the merits of Love's <u>Batson</u> claim.  The federal appellate
court held that the California Court of Appeal's refusal to conduct
a comparative juror analysis "was contrary to, or involved an
unreasonable application of, clearly established Federal law."
<u>Love</u>, 278 F. App'x at 717 (quoting 28 U.S.C. § 2254(d)(1)) (citing
<u>Kesser v. Cambra</u>, 465 F.3d 351, 360 (9th Cir. 2006) (en banc)).
Love's case was remanded "for an evidentiary hearing to determine
whether the prosecution struck Ms. M. from the jury because of her
race."  <u>Id.</u> at 718.  This Court will make that de novo finding
under <u>Batson</u>, 476 U.S. 79, and its progeny.

There is a well-established, three-part test for evaluating a
<u>Batson</u> challenge to the prosecutor's use of peremptory challenges.
<u>Ali v. Hickman</u>, No. 07-16731, 2009 WL 3401452, at *5.

> First, the defendant must make a prima facie showing that
> a challenge was based on race.  <u>See</u> <u>Kesser</u>, 465 F.3d at
> 359.  If such a showing is made, the burden then shifts
> to the prosecutor to produce a "clear and reasonably
> specific" race-neutral explanation for challenging the
> potential juror.  <u>See</u> <u>id.</u>  Third and finally, the court
> must determine whether, despite the prosecutor's
> proffered justification, the defendant has nonetheless
> met his burden of showing "purposeful discrimination."
> <u>See</u> <u>id.</u>

13

1  <u>Ali</u>, <u>id.</u>; <u>accord</u> <u>Love v. Scribner</u>, 278 F. App'x at 716.

2       A prima facie case of purposeful discrimination is established
3  if "(1) the prospective juror is a member of a 'cognizable racial
4  group,' (2) the prosecutor used a peremptory strike to remove the
5  juror, and (3) the totality of the circumstances raises an
6  inference that the strike was [motivated] by race." <u>Boyd v.</u>
7  <u>Newland</u>, 455 F.3d 897, 901 (9th Cir. 2006) (citations omitted).

8       Baker told the trial judge that he exercised a peremptory
9  challenge to McGee based on her occupation as a "social worker and
10 eligibility worker" and that his personal preference was that
11 "[t]eachers and social workers don't sit on the jury." (J. Mot.
12 File Tr. State Proceedings, Attach. #2 Tr. 371.) The Ninth Circuit
13 found the explanation "sufficient to satisfy the prosecutor's
14 burden at the second <u>Batson</u> step." <u>Love v. Scribner</u>, 278 F. App'x
15 at 716.

16      <u>Batson's</u> first two steps are "mere burdens of production," but
17 step three is where the challenge is decided. <u>Yee v. Duncan</u>, 463
18 F.3d 893, 898 (9th Cir. 2006). "Once a prosecutor has offered a
19 race-neutral explanation for the peremptory challenges and the
20 trial court has ruled on the ultimate question of intentional
21 discrimination, the preliminary issue of whether the defendant had
22 made a prima facie showing becomes moot." <u>Hernandez v. New York</u>,
23 500 U.S. 352, 359 (1991).

24      **A.   <u>The Mandate Rule</u>**

25      The remand to the district court was limited. The Ninth
26 Circuit explained, "[T]he [state] trial court did not allow Love to
27 examine the prosecutor's actual reasons for keeping the teaching-
28 connected individuals, while striking Ms. M. from the jury." <u>Love</u>

v. Scribner, 278 F. App'x at 718.  The district court was to hold

an evidentiary hearing to decide if Baker struck McGee from the

jury because she was African-American.   Id.

Petitioner and Respondent disagree on whether Baker may

amplify his earlier explanation for challenging McGee.  In its

opinion, the Ninth Circuit addressed Baker's comments but did not

decide their preclusive effect.

> In this case, the prosecutor explained that he excused
> the only available African-American member of the jury
> pool because she was a "social worker and eligibility
> worker" and his policy was that "teachers and social
> workers don't sit on the jury."  Because the disputed
> juror was an eligibility worker, whom the prosecution
> also described as a social worker, this explanation is
> sufficient to satisfy the prosecutor's burden at the
> second Batson step.

Love v. Scribner, 278 F. App'x at 716.  Love contends that

Respondent is attempting to recast prosecutor Baker's absolutism

into a flexible rule and is precluded from doing so.

"On remand, the doctrine of the law of the case is rigid; the

district court owes obedience to the mandate of . . . the court of

appeals and must carry the mandate into effect according to its

terms."  18 James Wm. Moore, et al., Moore's Federal Practice §

134.23[1][a], at 134-59 (3d ed. 2009) (footnote omitted).  "The

nondiscretionary aspect of the law of the case doctrine is

sometimes called the 'mandate rule.'"  Id. at 134-58 to 59

(footnote omitted).

"[I]n the Ninth Circuit, the mandate rule is jurisdictional,

implicating the 'power,' not just the preferred or common practice,

of the district courts."  Taltech Ltd. v. Esquel Enters., 609 F.

Supp. 2d 1195, 1200 (W.D. Wash. 2009) (citing United States v.

Thrasher, 483 F.3d 977, 982 (9th Cir. 2007)).  The rule precludes

06cv0640 WQH(RBB)

this Court from reconsidering any issue decided explicitly or by necessary implication by the Ninth Circuit. Id. "On remand, the trial court should only have considered matters left open by the mandate of [the appellate] court." Waggoner v. Dallaire, 767 F.2d 589, 593 (9th Cir. 1985) (internal quotations omitted) (citing Moore v. Jas. H. Matthews & Co., 682 F.2d 830, 834 (9th Cir. 1982)). Some circuits describe the rule as a "specific application of the law of the case doctrine." Jones v. Lewis, 957 F.2d 260, 262 (6th Cir. 1992) (citations omitted).

The mandate rule and the law of the case doctrine are frequently cited without differentiating one from the other. "There certainly is a difference between the two doctrines, and they are not identical. While both doctrines serve an interest in consistency, finality and efficiency, the mandate rule also serves an interest in preserving the hierarchical structure of the court system." United States v. Thrasher, 483 F.3d at 982. "[T]he [mandate] doctrine is 'similar to, but broader than, the law of the case doctrine.'" Id.

The Ninth Circuit remand limits this Court's jurisdiction. Id. (citation omitted); see also United States v. Hall, 434 F. Supp. 2d 19, 24 n.3 (D. Me. 2006) ("[N]ew evidence cannot be considered if it bears on an issue that was not left open by an appellate decision remanding for further proceedings on other issues.") (quoting 18B Charles Alan Wright et al., Federal Practice & Procedure: Jurisdiction 2d § 4478, at 685 (2d ed. 2002)).

"At Batson's second step, the question of whether the state has offered a 'race-neutral' reason is a question of law . . . ." Paulino v. Harrison (Paulino II), 542 F.3d 692, 699 (9th Cir. 2008)

16                                                              06cv0640 WQH(RBB)

(citation omitted).   In Petitioner's case, the question has been answered.   The appellate court found that step two in evaluating the <u>Batson</u> challenge was satisfied.   <u>Love v. Scribner</u>, 278 F. App'x at 716.   Step two pertains to the burden of producing evidence; the merits of the challenge are not resolved at that stage.   Thus, step two of the test is not the focus of this proceeding.

Baker's testimony that a disfavored occupation such as a social worker or teacher was merely a factor to consider when deciding whether to strike a possible juror cannot add to the analysis at step two.   Nevertheless, the testimony is relevant to this Court's "ultimate [step three] determination of whether there has been purposeful discrimination." <u>Yee</u>, 463 F.3d at 901; <u>see also Gonzalez v. Brown</u>, 07-56107, 2009 U.S. App. LEXIS 23891, at *18 (9th Cir. Oct. 30, 2009) ("While the issue of whether these facts establish the inference to support the first step of <u>Batson</u> is not before us, they are relevant to whether it was objectively unreasonable to conclude Gonzalez had not met his ultimate burden at <u>Batson</u> step three.)

**B.    The Motion to Strike Petitioner's Exhibit B**

Before considering the merits of Love's <u>Batson</u> claim, the Court must address Respondent's motion to strike Exhibit B to Petitioner's Post-Hearing Legal Brief.   (Post-Evidentiary Hr'g Reply Br. 1.)   Exhibit B is the transcript of an interview of former Assistant District Attorney Eric Baker.

In December of 2008, Baker was interviewed by counsel for the Respondent.   (Tr. Evidentiary Hr'g 33-36.)   The session was "tape recorded." (<u>Id</u>. at 35.)   A transcript of that interview was prepared and provided to Petitioner's counsel.   At the evidentiary

hearing, neither counsel for Petitioner nor counsel for Respondent sought to introduce the interview transcript into evidence, although both referred to the prior interview.  Two months later, on May 15, 2009, Love attached a copy of the Baker transcript as Exhibit B to Petitioner's Post-Hearing Legal Brief.

The Respondent notes that Love's attorney was provided an opportunity to submit additional evidence at the conclusion of the evidentiary hearing, but he declined.  (Post-Evidentiary Hr'g Reply Br. 1.)  Petitioner's counsel stated that he had no further evidence and only asked that one exhibit, a letter from the Imperial County District Attorney's Office, be admitted into evidence.  (Tr. Evidentiary Hr'g 85-86.)  Respondent complains that the "attempt to submit new evidence at this late [juncture] is improper." (Post-Evidentiary Hr'g Reply Br. 1.)  He also objects to the interview transcript as hearsay and lacking foundation. (Id.)

Petitioner describes Exhibit B as a copy of an "interview [of Baker] conducted in the Attorney General's office at which two deputies (including current counsel) were present, along with an investigator, and Mr. Baker's daughter.  The interview was conducted ex parte, and there was no questioning by opposing counsel." (Opp'n Mot. Strike & Surreply 2.)  Love contends that the prosecutor confirmed the substance of the interview at the evidentiary hearing; and for that reason, there should be no doubt as to its authenticity.  (Id.)  The interview took place over six months before Love submitted it to the Court and was referred to extensively during the evidentiary hearing, so there was no unfair surprise.  (Id.)  Additionally, Love argues that "the interview

citations show merely to what extent Mr. Baker's memory was confirmed or not by his prior rendition." (<u>Id.</u>)  He maintains that this use of the transcript is not hearsay.  (<u>Id.</u>)

In his Post-Hearing Brief, Love cites the federal evidentiary hearing and Baker interview transcripts in tandem.  (Pet'r's Post-Hr'g Br. 7-12, 14, 17.)  Although he argues to the contrary, Petitioner is seeking to use the transcribed interview as substantive evidence.  Labeling his use a "non-hearsay purpose" does not make it so.

In neither his Post-Hearing Brief nor his Opposition to Motion to Strike did Love ask to reopen the record to lay the foundation and introduce the Baker interview into evidence.  A motion to reopen the record to submit additional evidence is addressed to the sound discretion of the Court.  <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 331 (1971) (citations omitted).  "[T]he particular criteria that guide a trial court's decision to reopen are necessarily flexible and case-specific . . . ."  <u>Rivera-Flores v. Puerto Rico Telephone Co.</u>, 64 F.3d 742, 746 (1st Cir. 1995).  The Court should consider whether:  "(1) [T]he evidence sought to be introduced is especially important and probative; (2) the moving party's explanation for failing to introduce the evidence earlier is <u>bona fide</u>; and (3) reopening will cause no undue prejudice to the nonmoving party."  <u>Id.</u> (citations omitted).

The Baker interview is cumulative.  Love fails to highlight any statement in the transcript that is particularly probative. Courts generally act within their discretion in refusing to reopen a case for cumulative evidence or evidence with little probative value.  <u>Id.</u> (citing <u>Joseph v. Terminix Int'l Co.</u>, 17 F.3d 1282,

1285 (10th Cir. 1994); <u>Thomas v. SS Santa Mercedes</u>, 572 F.2d 1331,
1336 (9th Cir. 1978)).  In <u>Thomas</u>, the Ninth Circuit found that the
trial court acted within its discretion in denying a motion to
reopen to hear new evidence that "does not have the persuasive
power [appellant] claims for it."  <u>Thomas</u>, 572 F.2d at 1336.

The state trial court proceedings and Baker's testimony at the
federal evidentiary hearing are before the Court.  In this context,
the transcript of Baker's tape recorded interview is not
"especially important and probative."

Petitioner offers no reason why the transcript could not have
been introduced into evidence before his Post-Hearing Brief, filed
two months after the evidentiary hearing concluded [doc. nos. 43,
48].  Inadvertence is not a compelling explanation.  Yet,
Respondent does not claim that he will be prejudiced by
consideration of the transcript.  (Resp't's Post-Evidentiary Hr'g
Reply Br. 1.)  Instead, he argues that it is hearsay and lacks
foundation.  (<u>Id.</u>)

It is unclear whether the interview was under oath; the
transcript was not certified by a reporter; Baker did not review it
for mistakes; and he did not sign the transcript.  (<u>See</u> Pet'r's
Post-Hr'g Br. Ex. B at 5-6, 63; Tr. Evidentiary Hr'g 34-36.)  The
objections are well taken.  This proceeding will not be reopened to
provide Love an opportunity to introduce the Baker interview
transcript into evidence.

Alternatively, Love moves to include Exhibit B as a document
relating to the Petition pursuant to Rule 7(a), Rules Governing §
2254 Cases, 28 U.S.C. foll. § 2254.  (<u>Id.</u> at 3.)  The rule provides
that "the judge may direct the parties to expand the record by

submitting additional materials relating to the petition."  Rule 7(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  "The purpose [of the rule] is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing."  Id. advisory committee's note on 1976 adoption.  "An expanded record may also be helpful when an evidentiary hearing is ordered."  Id.

> But with respect to methods for securing facts where necessary to accomplish the objective of [habeas] proceedings Congress has been largely silent.  Clearly, in these circumstances, the habeas corpus jurisdiction and the duty to exercise it being present, the courts may fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage.

Harris v. Nelson, 394 U.S. 286, 299 (1969).  But cf. Williams v. Schriro, 423 F. Supp. 2d 994, 1003 (D. Ariz. 2006) (refusing to allow petitioner to supplement the record with declarations that were not relevant to his claims).

Rule 7(b) identifies items that may be included in an expanded record.  "The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge.  Affidavits may also be submitted and considered as part of the record."  Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  The Baker interview is different in kind from the materials listed in Rule 7(b).

Love's attempt to make the transcript part of the record two months after the evidentiary hearing is inconsistent with the standards for expanding the record.  In Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241-42 (9th Cir. 2005), the court held that to

21

1  expand the record without an evidentiary hearing, a habeas
2  petitioner must comply with the diligence requirement in §
3  2254(e)(2).  Neither case law, AEDPA, nor Rule 7 set a standard for
4  expanding the record after an evidentiary hearing has closed.
5  Nevertheless, the diligence requirement that permeates AEDPA will
6  be applied here.

7       Petitioner was not diligent in seeking to expand the record
8  after the close of evidence.  The Baker interview transcript is not
9  the type of post-evidentiary hearing material for which Rule 7 is
10 suited.  The interview was tape recorded and does not appear to
11 have been given under oath.  (Tr. Evidentiary Hr'g 35-36.)  The
12 transcript is not signed, was not reviewed, and the question-and-
13 answer session took place long after the filing of Love's habeas
14 Petition.  The content of the interview is not especially important
15 or probative and does little to "clarify the relevant facts."  See
16 Vasquez v. Hillery, 474 U.S. 254, 258 (1986) (citation omitted).
17 For all these reasons, Love's request to expand the record to
18 include the Baker interview transcript is denied, and Respondent's
19 Motion to Strike Exhibit B to Petitioner's Post-Hearing Legal Brief
20 is **GRANTED**.

21      **C.   The Batson Challenge**

22      The Equal Protection Clause of the Fourteenth Amendment
23 prevents a prosecutor from purposefully excluding potential jurors
24 on the basis of racial identity.  Batson, 476 U.S. at 85-88.
25 "[T]he 'Constitution forbids striking even a single prospective
26 juror for a discriminatory purpose.'"  Williams v. Runnels, 432
27 F.3d 1102, 1107 (9th Cir. 2006) (quoting United States v.
28 Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)).  "The Batson

framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." Johnson v. California, 545 U.S. 162, 172 (2005) (citation omitted).

The prosecutor has the burden of producing a race-neutral reason for the challenged strike. Kesser v. Cambra, 465 F.3d at 359 (citing Batson, 476 U.S. at 98; Purkett v. Elem, 514 U.S. 765, 767 (1995) (per curiam). The proffered explanation need not be "persuasive, or even plausible" to be race-neutral. Purkett, 514 U.S. at 767-68. The reason must, however, be "related to the particular case to be tried." Batson, 476 U.S. at 98 (footnote omitted). Notably, "[a] Batson challenge does not call for a mere exercise in thinking up any rational basis." Miller-El v. Dretke, 545 U.S. 231, 252 (2005). "[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." Id.

The Court may not substitute its reasoning to satisfy the prosecutor's burden at step two of a Batson analysis. Id. Baker's statement to the trial court was categorical: "Teachers and social workers don't sit on the jury." (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 371.)

### 1. Proving Purposeful Discrimination at Step Three

At step three of the Batson inquiry, the question is "whether the opponent of the strike has proved purposeful racial discrimination." Johnson, 545 U.S. at 168 (citing Purkett v. Elem, 514 U.S. at 767). The ultimate burden of persuasion regarding racial motivation "rests with, and never shifts from, the opponent

1  of the strike." <u>Id.</u> at 171 (quoting <u>Purkett</u>, 514 U.S. at 768).

2  Thus, Petitioner Love has the burden of proving purposeful

3  discrimination. <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006).

4    The burden, however, is not a heavy one. Love must establish

5  "purposeful discrimination by a preponderance of the evidence."

6  <u>Paulino II</u>, 542 F.3d at 703; <u>accord</u> <u>Hardcastle v. Horn</u>, 521 F.

7  Supp. 2d 388, 401 (E.D. Pa. 2007).

8    In deciding whether Petitioner has carried his burden, the

9  Court must "assess the plausibility of [the prosecutor's reason for

10 striking the challenged juror] in light of all evidence with a

11 bearing on it." <u>Miller-El v. Dretke</u>, 545 U.S. at 252 (citations

12 omitted). The prosecutor may not "rebut the [Petitioner's] case

13 merely by denying that he had a discriminatory motive or

14 'affirm[ing] [his] good faith in making individual selections.'"

15 <u>Batson</u>, 476 U.S. at 98 (quoting <u>Alexander v. Louisiana</u>, 405 U.S.

16 625, 632 (1972)). The Court considers whether the reasons advanced

17 by the prosecutor are "pretextual," and the conclusion "'largely

18 will turn on evaluation of credibility.'" <u>Hernandez</u>, 500 U.S. at

19 365 (quoting <u>Batson</u>, 476 U.S. at 98 n.21).

20   As the Supreme Court noted, "In the typical peremptory

21 challenge inquiry, the decisive question will be whether counsel's

22 race-neutral explanation for a peremptory challenge should be

23 believed." <u>Id.</u> "'[A] finding of intentional discrimination is a

24 finding of fact' entitled to appropriate deference by a reviewing

25 court." <u>Batson</u>, 476 U.S. at 98 n.21 (quoting <u>Anderson v. Bessemer

26 City</u>, 470 U.S. 564, 573 (1985)); <u>accord</u> <u>Paulino II</u>, 542 F.3d at 699

27 (stating that "purposeful discrimination" raises a question of

28 fact).

1

### a.   The Evidentiary Hearing

2        The evidentiary hearing in this case took place on March 12,

3   2009.  Baker had excused McGee from the jury over five and one-half

4   years earlier, on July 21, 2003.  Before and after Love's trial,

5   Baker tried many other cases.  (Tr. Evidentiary Hr'g 32-33.)  He

6   acknowledged that it was "very tough to remember the details [of

7   Love's trial]."  (Id. at 34.)  "I'm trying to go on exactly what I

8   recall and what refreshes my recollection with the caveat . . .

9   it's difficult not to insert your common practice and things like

10  that and assume that happened.  And I'm endeavoring not to do

11  that."  (Id. at 37.)

12       Baker described his general guidelines for selecting jurors.

13  (Id. at 5-13.)  But he did not independently recall his reasons for

14  striking McGee from the jury.  (Id. at 37.)  He was able to recall

15  the reason for the peremptory challenge only because he consulted

16  the transcripts of the state trial proceedings.  (Id.)  At the

17  trial, Baker had the juror notes taken by his predecessor, but at

18  the evidentiary hearing, he did not remember what information was

19  noted for each potential juror.  (Id. at 52-53.)  Baker was careful

20  not to overstate what he actually recalled of July 21, 2003.  As a

21  result, his testimony did not significantly alter the state court

22  record.

23       A memory lapse or the failure to recall the details of jury

24  voir dire is not determinative.  See Gonzalez v. Brown, No. 07-

25  56107, 2009 U.S. App. LEXIS 23891, at **20-21.  In Gonzalez, the

26  Ninth Circuit explained:

27       The prosecutor's failure to give a valid and race-neutral
         reason for her peremptory strike of the first juror
28       [because "she simply could not remember why she had
         excused the first juror"] weighs against her in an

> assessment of her motive, but that is not all that was
> before the state trial court and it had other good
> reasons to conclude there was not purposeful
> discrimination.

Id. The Gonzalez court, id. at *20, noted that in Yee, 463 F.3d

893, the Ninth Circuit "revers[ed] the grant of habeas on AEDPA

standard of review where [the] prosecutor could not recall why she

had stricken one juror." Later, in Paulino II, it "affirm[ed] the

grant of habeas on de novo review where the prosecutor could not

recall why she had stricken any of the African-American jurors."

Id. Baker's inability to reconstruct his reasons for striking

McGee and not striking others may undermine Respondent's argument,

but it is not fatal.

Petitioner argues that "[i]n light of the manifest

deficiencies in Baker's ability to recall and report accurately the

details surrounding the Batson challenge, the Court must treat his

testimony as to historical facts as deserving no weight, as in

Paulino." (Pet'r's Post-Hr'g Br. 12); see Paulino II, 542 F.3d at

701 (stating that at step two of a Batson analysis, the

prosecutor's speculation was not circumstantial evidence of her

actual reasons for striking African-Americans).

Respondent concedes that Baker did not remember some aspects

of Love's trial, but he argues that during the evidentiary hearing,

Baker remembered striking McGee because of her occupation and not

because of her race. (Post-Evidentiary Hr'g Reply Br. 3-4.)

Respondent distinguishes Love's case from Paulino. He argues that

during the state court proceedings, the prosecutor in Paulino was

never asked for an explanation for her strikes; she had no

independent or refreshed memory of voir dire; and the state failed

26

carry its burden at stage two to produce a race-neutral reason for the strikes. (Id. at 2-3.) Counsel concludes, "The most striking distinction with Paulino is that here the state satisfied its burden of production at Batson's stage two by providing a race-neutral reason for excusing Ms. M[cGee] -- her occupation as an eligibility worker." (Id. at 3.)

Baker gave the trial judge a single, race-neutral reason for his challenge to McGee; and during the evidentiary hearing, the prosecutor recalled that he struck McGee because of her occupation. (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 371; Tr. Evidentiary Hr'g 25, 56, 73, 77, 81.)

During Love's Wheeler/Batson challenge at the close of voir dire, Judge Jones told Love that "the employment background of Ms. McGee I find would be a reasonable explanation . . . ." (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. at 373.) The judge understood the sole reason for striking McGee was her occupation, and Baker did not correct him or state that there were additional factors. The trial judge was not clairvoyant; he could only have found the prosecutor's reason for striking McGee to be what Baker explained.

During the evidentiary hearing, Baker explained that he would merely have some concerns over jurors who were teachers or social workers. (Tr. Evidentiary Hr'g 7, 9.) He did not have a general rule that a teacher or social worker would never sit on a jury. (Id. at 10.) The prosecutor said there are a "myriad of intangibles" that are involved in juror selection, and his aversion to teachers and social workers was more a "guideline" or "rule of thumb." (Id. at 7-8; see also id. at 10, 59, 61-62, 71-72.)

27

1    When asked whether he considered teachers or social workers
2  "negative prosecution jurors," Baker responded that he would not
3  "put it that strongly."  (<u>Id.</u> at 9.)  The prosecutor testified that
4  his categorical statement in Love's case was hyperbole.  (<u>Id.</u> at
5  26.)  Baker explained that there are no "blanket rules in jury
6  selection."  (<u>Id.</u> at 72.)

7    Not surprisingly, Baker was asked, "Did you strike her [McGee]
8  because she was an African-American?"  His answer was "no."  (<u>Id.</u>
9  at 25.)  He was also asked, "Did her being an African-American in
10  any way play into your decision to strike her?"  (<u>Id.</u>)  Baker
11  responded, "Of course not."  (<u>Id.</u>)  The prosecutor's denial of any
12  discriminatory motive for striking the only African-American on the
13  jury is welcomed, but only goes so far.  It is not enough to rebut
14  Petitioner's case.  <u>See</u> <u>Batson</u>, 476 U.S. at 98.

15    Respondent argues that Baker had another reason for striking
16  McGee.  (Post-Evidentiary Hr'g Opening Br. 6-7.)  He contends that
17  Baker had been a prosecutor on a different case in which a teacher
18  or social worker expressed disapproval of the state pursuing a case
19  against a person who was already incarcerated.  (<u>Id.</u>)  The
20  Respondent implies that because Love was incarcerated at the time
21  of his trial, Baker was concerned about a similar reaction.  (<u>Id.</u>)

22    The prosecutor's testimony was not that precise.  He did not
23  recall whether a social worker, teacher, law enforcement officer,
24  or someone in another occupation made the comment that prosecuting
25  those already in prison was a waste of money when government
26  employees were getting pink slips.  (Tr. Evidentiary Hr'g 63.)
27  Baker never stated that this negative experience occurred before
28  Love's case or that he considered this experience when he

challenged McGee.  (<u>Id.</u> at 8, 63–65.)  Arguably, he addressed
wasting financial resources when he asked the potential jurors if
anyone "felt uncomfortable that this happened in state prison?"
(J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 366.)  Baker's
anecdote is too general to conclude that it had any bearing on
striking McGee from the jury.

     At the federal evidentiary hearing, Baker did not remember any
reason for striking McGee, other than her occupation.  Additional
reasons offered by Respondent are speculative and, at step three,
cannot supplement the explanation Baker stated for excusing McGee
from the jury.  <u>See Paulino II</u>, 542 F.3d at 700 (citations
omitted).  The prosecutor's challenge will stand or fall on the
single, race-neutral reason he gave the trial judge and
circumstantial evidence.  <u>See Miller-El</u>, 545 U.S. at 252.

### b.   Direct or Circumstantial Evidence

     "Evidence of a prosecutor's actual reasons [for striking a
juror] may be direct or circumstantial, but mere speculation is
insufficient."  <u>Paulino II</u>, 542 F.3d at 700 (citations omitted).
"[C]ircumstantial evidence is a set of facts from which another
fact may be inferred, as opposed to direct evidence, which goes
directly to the fact to be established."  <u>Id.</u> at 700 n.6.
"[D]irect evidence of the prosecutor's discriminatory intent will
often be hard to produce."  <u>Wilson v. Beard</u>, 426 F.3d 653, 670 n.18
(3d Cir. 2005) (citation omitted).

     In <u>Miller-El</u>, 545 U.S. at 241, the Supreme Court cited <u>Reeves
v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000), with
approval, for the proposition that proof that an "explanation is
unworthy of credence is simply one form of circumstantial evidence

that is probative of intentional discrimination, and it may be quite persuasive[.]"  "A comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination."  Turner v. Marshall, 121 F.3d 1248, 1251-52 (9th Cir. 1997).  "Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised."  McClain v. Prunty, 217 F.3d 1209, 1221 (9th Cir. 2000) (citing Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir. 1998); Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir. 1993).  "The fact that one or more of a prosecutor's justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason."  McClain, id. (citing United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989).

    The prosecutor told the trial judge that he struck McGee because "she's a social worker and eligibility worker. . . . Teachers and social workers don't sit on the jury. . . .  They are not favorable jurors to the prosecution."  (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 371-72.)  McGee was an eligibility worker, which was within Baker's definition of social worker.  The race-neutral reason for striking McGee did not distinguish teachers from social workers.  Likewise, at the evidentiary hearing, Baker did not distinguish between the two.  (Tr. Evidentiary Hr'g 2-82.)  He testified that both tend to be "sympathetic people," and "their perspective is rehabilitative."  (Id. at 7.)

    The Court must consider whether a comparative analysis of jurors should be limited to teachers and social workers, because

1    those were the disfavored occupations cited by the prosecutor, or

2    whether "teacher" should include instructional assistants and

3    teacher's aides.

4         In Love v. Scribner, the court observed:

5         The prosecutor's stated reason applied to both teachers
          and social workers.  Once again, where, as here, the
6         prosecutor's stated reason does not hold up, "[i]ts
          pretextual significance does not fade," because an
7         appellate judge, looking at the record, can construct a
          different rationale, here an antipathy toward social
8         workers but not teachers.

9    Love, 278 F. App'x at 718 (quoting Miller-El, 545 U.S. at 252).

10        The Ninth Circuit found fault with the state court analysis:

11        Hypothesizing that the "decision to retain the three
          teaching-connected jurors may well have been motivated by
12        countervailing factors in their background that
          ameliorated concerns about their potential antipathy,"
13        the California appellate court noted that each of the
          teaching-connected individuals still on the jury was
14        "older," and that two of them were married to individuals
          "whose occupations . . . perhaps suggest a more
15        conservative outlook."

16            Such speculation does not comply with the
          requirement that a court considering a Batson challenge
17        compare what the prosecution said in explanation of its
          peremptory challenges with what it actually did.

18

19   Id. at 717.

20        In the order remanding this case for an evidentiary hearing,

21   the district court was directed to conduct a comparative analysis

22   of McGee and the teaching-connected individuals who served on the

23   jury.  Id. at 718.  Love contends that the Court must define the

24   term "teacher" broadly because the law of the case doctrine compels

25   it.  (Pet'r's Post-Hr'g Br. 5 (citing Love v. Scribner, 278 F.

26   App'x at 717 n.1).)

27        Respondent counters that "[w]hether or not Mr. Baker

28   considered [jurors with teaching-related jobs as being] teachers is

not a binding legal issue that the Ninth Circuit has already

decided." (Post-Evidentiary Hr'g Reply Br. 10.) He argues that a

determination that those jurors are similarly situated to McGee has

not been made. (Id.)

As discussed earlier, the mandate rule precludes reconsidering

an issue that has already been decided by the same or a higher

court. See United States v. Alexander, 106 F.3d 874, 876 (9th Cir.

1997) (quoting Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993)).

In Love's case, the Ninth Circuit explained, "[T]he prosecution

appears to have defined the term 'social worker' broadly to include

eligibility workers. This calls for a broad interpretation of the

term 'teacher' to include instructional assistants and teacher's

aides." Love v. Scribner, 278 F. App'x at 717 n.1. The case was

remanded because the record did not "provide an adequate basis for

determining de novo whether the real reason the prosecutor struck

Ms. M. was her race. . . . [T]he trial court did not allow Love to

examine the prosecutor's actual reasons for keeping the teaching-

connected individuals, while striking Ms. M. from the jury." Id.

at 718.

Not every statement in the Ninth Circuit opinion is law of the

case or subject to the rule of mandate. "For the [law of the case]

doctrine to apply, the issue in question must have been decided

explicitly or by necessary implication in [the] previous

disposition." Rebel Oil Co. v. Atl. Richfield Co., 146 F.3d 1088,

1093 (9th Cir. 1998). "An issue was decided implicitly when its

resolution "was a necessary step in resolving the earlier

appeal . . . [and was] so closely related to the earlier appeal its

resolution involves no additional consideration and so might have

been resolved but unstated." <u>In re Meridian Reserve, Inc.</u>, 87 F.3d
406, 409-10 (10th Cir. 1996) (<u>quoting</u> <u>Guidry v. Sheet Metal Workers</u>
<u>Int'l Ass'n</u>, 10 F.3d 700, 707 (10th Cir. 1993)(footnote omitted)).

General remarks by the appellate court about a broader issue
not necessary to the result are dicta.  <u>See</u> <u>Milgard Tempering, Inc.</u>
<u>v. Selas Corp. of Am.</u>, 902 F.2d 703, 716 (9th Cir. 1990); <u>Arcam</u>
<u>Pharm. Corp. v. Faria</u>, 513 F.3d 1, 3 (1st Cir. 2007) (commenting
that dicta are "observations in a judicial opinion or order that
are 'not essential' to the determination of the legal questions
then before the court[]") (quoting <u>Municipality of San Juan v.</u>
<u>Rullan</u>, 318 F.3d 26, 29 n.3 (1st Cir. 2003).  Dicta have no
preclusive effect and are not law of the case.  <u>Rebel Oil Co.</u>, 146
F.3d at 1093.

When making its juror comparisons, neither the law of the case
doctrine nor the rule of mandate requires the Court to consider
instructional assistants and teacher's aides to be teachers.  The
prosecutor's stated race-neutral explanation is the touchstone.
Even so, a comparison between McGee and each juror with a teaching-
related career is instructive.  Prosecutor Baker acknowledged that
the distinction between teachers, instructional assistants, and
teacher's aides was not one of kind, but of degree.  (Tr.
Evidentiary Hr'g 56-58.)

### c.  Comparative Analysis

In <u>Miller-El</u>, 545 U.S. at 241, the Court endorsed using a
comparative analysis to review striking some jurors and not others.
"If a prosecutor's proffered reason for striking a black panelist
applies just as well to an otherwise-similar nonblack who is
permitted to serve, that is evidence tending to prove purposeful

discrimination to be considered at <u>Batson's</u> third step."  <u>Id.</u>
(citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. at
147).  A "side-by-side comparison" is made of the African-American
who was stricken from the panel with others allowed to serve.  <u>Id.</u>
For a comparative analysis to be useful, the compared jurors must
be similarly situated.  <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1049 n.9,
1050 (9th Cir. 2004).

    Juror four, Ramirez, and McGee were among the potential jurors
who already had participated in judicial voir dire, been questioned
by Kowalski, and were seated in the jury box when Baker took over
Love's case.  (J. Mot. File Tr. State Proceedings, Attach. #1 Tr.
176, 264, 291-93.)  Respondent explains that there is "no evidence"
that Baker was aware of the potential jurors' biographical
information unless he was present during their voir dire.  <u>See</u>
(Post-Evidentiary Hr'g Opening Br. 9.)  Yet, he was present for the
court's voir dire of jurors eight and ten, the alternate, and
others on the jury.  (<u>See</u> J. Mot. File Tr. State Proceedings,
Attach. #2 Tr. 349-63.)

    Baker relied on prosecutor Kowalski's notes in deciding whom
to strike.  (Tr. Evidentiary Hr'g 21, 25.)  At trial, he told the
court that he "referred to Chris Kowalski's notes who was [at the]
original voir dire."  (J. Mot. File Tr. State Proceedings, Attach.
#2 Tr. 371.)  The notes, however, were never recovered; and at the
evidentiary hearing, Baker could not recall what information was on
the notes, other than the challenged jurors' occupations. (Tr.
Evidentiary Hr'g 16-18, 21-23, 38-39, 52-55, 75.)  At trial, Baker
explained to the trial judge why he struck McGee from the jury.
"It appears she was an eligibility worker."  (J. Mot. File Tr.

State Proceedings, Attach. #2 Tr. 371.)  "I excused both of those [prospective jurors McGee and Ramirez] that I believed to be that [social workers]."  (<u>Id.</u>)

Petitioner argues, "As the [Kowalski] notes are missing, and Baker can recall nothing about the format or content of the notes, the safest course is to assume that all the information in the record was accurately reported in the notes and Baker duly informed himself of those few facts he had available to him."  (Opp'n Mot. Strike & Surreply 6.)  Whether by the Respondent or Petitioner, speculation about the prosecutor's knowledge or motive is not circumstantial evidence of the absence or existence of discriminating intent.  See <u>Paulino II</u>, 542 F.3d at 700.

Because Kowalski's notes are missing and Baker was not present for the entire voir dire, the Court cannot attribute to him complete knowledge of what each potential juror disclosed.  The prosecutor's limited recall hampers his ability to explain what appears to be a racially-motivated peremptory strike.  This shortcoming is another of the many relevant facts to be considered. <u>See</u> <u>Kesser</u>, 465 F.3d at 359 (citing <u>Hernandez</u>, 500 U.S. at 363).

### i.   McGee and Juror Ten -- The Teacher

McGee was an eligibility worker; juror ten was a school teacher.  Love contends that from the prosecution's view, juror ten and McGee each held a disfavored occupation, and this is "the crucial similarity for purposes of this case."  (Pet'r's Post-Hr'g Br. 17 (emphasis omitted).)

Respondent acknowledges that juror ten was a school teacher, "[t]herefore, she had one characteristic that the prosecutor disfavored, similar to Ms. M[cGee]."  (Post-Evidentiary Hr'g

Opening Br. 9.)  Respondent distinguishes the two by explaining
that juror ten had "very conservative, pro-prosecution aspects of
her background that Ms. M[cGee] lacked." (Id. at 10.)  Namely, her
ex-husband was a farmer, and McGee's spouse was an electrician.
(Id.)  Juror ten was a resident of Hotville, which was "a very
conservative, small town," and McGee did not state where she
resided.  (Id.)  According to Respondent, the meaningful difference
between juror ten and McGee was that juror ten "had close
connections to the local agricultural community." (Post-
Evidentiary Hr'g Reply Br. 11.)

     Baker's peremptory strike of McGee must "stand or fall on the
plausibility of the reasons he [gave]." Miller-El, 545 U.S. at
252.  "Teachers and social workers don't sit on the jury." (J.
Mot. File Tr. State Proceedings, Attach. #2 Tr. 371.)  Even so, he
struck the social worker and did not strike the teacher.  "An
inference of discrimination may arise when two or more potential
jurors share the same relevant attributes but the prosecutor has
challenged only the minority juror." United States v. Collins, 551
F.3d 914, 922 (9th Cir. 2009).  Thus, pretext is shown because
Baker's stated reason applied equally to juror ten, who was not
African-American.  She was permitted to serve on the jury but McGee
was not.  See Miller-El, 545 U.S. at 241.

     Respondent argues there were additional pro-prosecution
factors that caused Baker to strike McGee and not strike juror ten.
(Post-Evidentiary Hr'g Reply Br. 11-12, 14.)  Although this may be
true, Baker did not actually remember any reasons for leaving a
teacher, juror ten, on the jury. (Tr. Evidentiary Hr'g 28-29.)  He
was present during the court's voir dire, when she identified

herself as a teacher.  (<u>Id.</u> at 29.)  She also described her ex-husband as a farmer, stated that she lived in Holtville, and was a juror in a criminal case fifteen years earlier.  (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 351.)  Baker stated that "Holtville farming families are extremely conservative and tend to be friendly prosecution jurors."  (Tr. Evidentiary Hr'g 30.)  He preferred jurors who "had prior jury experience where the jury was able to reach a verdict so they can be decisive."  (<u>Id.</u> at 6.)

Still, the prosecutor did not recall why he left a teacher on the jury, and counsel's attempt to refresh his recollection was unsuccessful.  (<u>Id.</u> at 28-29.)  "A <u>Batson</u> challenge does not call for a mere exercise in thinking up any rational basis."  <u>Miller-El</u>, 545 U.S. at 252.  The Court is precluded from speculating about Baker's actual reasons for allowing juror ten to serve while striking McGee.  Because the prosecutor did not apply his race-neutral reason to a similarly-situated individual who was not African-American, his explanation is not credible.  <u>McCain</u>, 217 F.3d at 1220-21.

### ii.  McGee and Juror Eight -- The Teacher's Aide

Baker was present during the judicial voir dire of juror eight.  She was married, had one grandchild, was employed as a "teacher's aide," and had served on a jury ten to twelve years earlier, but she could not recall whether it was a civil or criminal case.  (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 352.)  Her husband was a retired cowboy from a feed lot.  (<u>Id.</u>)

Baker testified that a teacher's aide would be less of a concern than an elementary school teacher.  (Tr. Evidentiary Hr'g 31.)  Juror eight was a grandmother and her husband's ties to the

agricultural and stockyard communities could be positive factors. (<u>Id.</u>)

Again, the prosecutor did not recall why he kept juror eight on the panel but excused McGee. At best, he speculated about how her occupation "would have struck [him]." (<u>Id.</u>) Her husband's former occupation and that she was a grandmother "could be" positive factors. <u>Id.</u> Like the prosecutor in <u>Paulino II</u>, Baker "did nothing more than guess why [he] might have removed [or kept] the jurors in question." <u>Paulino II</u>, 542 F.3d at 700. The failure to articulate a reason for striking McGee but not striking others with a disfavored occupation is evidence of purposeful discrimination.

### iii. McGee and Juror Four -- The Instructional Assistant

Juror four was examined by the court while Kowalski was present. She disclosed that she was married with three children, had one grandchild, worked as an "instructional assistant" and had no prior jury experience. (J. Mot. File Tr. State Proceedings, Attach. #1 Tr. 176.) Her husband was a maintenance worker, and on that day, she was "on vacation." (<u>Id.</u>)

Prosecutor Baker did not recall any information about juror number four. (Tr. Evidentiary Hr'g 27-28.) He offered no reason for keeping her –- the instructional aide –- but striking McGee. (<u>Id.</u>) Baker conceded that the difference between a teacher and instructional assistant is one of degree. (<u>Id.</u> at 56-58.) The failure to excuse juror four supports the inference that challenging the only African-American was racially motivated.

### iv.   McGee and Juror Six -- The Student

Petitioner briefly argues that "Juror 6, may be considered to have an indirect educational connection through her husband, as well as being perhaps a recent education student." (Pet'r's Post-Hr'g Br. 5 n.6.)  Love is correct that jurors subject to a comparative analysis are not required to have all the same characteristics to be similarly situated.  (Id. at 16); see Green v. La Marque, 532 F.3d 1028, 1030 n.3 (9th Cir. 2008).

Nevertheless, he overstates his claim for including juror six in a comparison of McGee and all teaching-connected individuals. Juror six had just graduated from San Diego State University in May of 2003; she had no prior jury experience; and her husband was an "admission representative" for a technical school in Phoenix.  (J. Mot. File Tr. State Proceedings, Attach. #1 Tr. 269.)  She had some friends who were local correctional officers.  (Id. at 285.)

Juror six is not similarly situated to the other jurors who are the subject of this comparative analysis.  Her occupation can best be described as an unemployed, recent college graduate. Because she is not a comparable juror, the failure to strike her from the jury is not probative of Baker's intent.  See Mitleider v. Hall, 391 F.3d at 1049 n.9, 1050.

### v.   McGee and Ramirez -- The Social Security Employee

Love also contends that Baker's testimony at the evidentiary hearing contradicted the explanation he provided to the trial judge regarding striking social workers.  (Pet'r's Post-Hr'g Br. 12.) Petitioner states that the prosecutor claimed to have excused "both" jurors he considered to be social workers, referring to

McGee, an eligibility worker, and Ramirez, an employee at the Social Security office. (<u>Id.</u> at 13.) Love claims that Baker "deliberately misrepresented the scope of his 'rule of thumb' to Judge Jones in responding to the <u>Batson/Wheeler</u> objection . . . [to] create[] an impression of consistency which he knew was false." (<u>Id.</u>; <u>see also</u> Opp'n Mot. Strike & Surreply 6.)

Respondent asserts that any perceived discrepancy between Baker's explanation at trial and his testimony at the evidentiary hearing is the result of Baker's reliance on the previous prosecutor's notes. (Post-Evidentiary Hr'g Reply Br. 7.) Baker was not present when Ramirez was questioned by the court. (<u>Id.</u>) Although Kowalski's notes have not been located, Respondent argues, "Mr. Baker understood at the time of trial that Mr. Ramirez was a social worker and that is why he chose to exercise a peremptory challenge against him." (<u>Id.</u>)

At the evidentiary hearing, Baker explained that he did not consider a person who worked at the Social Security office to be a social worker. (Tr. Evidentiary Hr'g 58.) He did not recall whether, in addition to McGee, he challenged any other juror who was a social worker. (<u>Id.</u> at 26-27.)

A comparison of the race-neutral reason the prosecutor gave in defense of his strike of McGee with his predecessor's voir dire notes may be useful to show Baker's representation was a pretense. <u>See</u> <u>Johnson v. Vasquez</u>, 3 F.3d at 1330 (comparing prosecutor's testimony with his notes on a "jury panel scratch sheet"). But here, the Court only has Baker's statement to the trial judge and his testimony at the evidentiary hearing to consider. The notes taken by Baker's predecessor are not available. Of course, working

at the Social Security office and being an eligibility worker are not necessarily synonymous.  What matters is that Baker thought the two individuals were similarly situated.

The Court observed Baker's demeanor during the evidentiary hearing.  He went to great lengths not to overstate the prosecution's case for dismissing juror McGee.  Based on his demeanor, his last-minute entrance into the case, and that he was not in attendance when Ramirez was examined, the Court cannot attribute to Baker the intent to deceive that Love suggests.  The statement that the prosecutor excused both that he perceived to be social workers has little effect on this comparative analysis.

### vi.  Alternate Juror Selection -- The Teacher

Courts often consider the selection of alternate jurors when performing a comparative analysis.  See United States v. Collins, 551 F.3d at 921 n.2 (noting an African-American alternate juror was struck for cause); Green v. LaMarque, 532 F.3d at 1033 (comparing the manner in which the prosecutor questioned possible jurors including an alternate); see also Johnson v. California, 545 U.S. at 165 (considering the composition of the jury including alternates); Ford v. Georgia, 498 U.S. 411, 415 (1991) (considering defendant's challenge of an alternate juror); Kesser v. Cambra, 465 F.3d at 354 (same).  Likewise, this Court will include alternate selection in its comparative analysis.

Respondent argues that striking the alternate was not comparable to striking McGee.  (Post-Evidentiary Hr'g Opening Br. 10.)  Garibay, the first prospective alternate, was a teacher, but Baker chose to strike Noris, the second possible alternate, who "was single, had no children, had no prior jury experience, and was

a student . . . ." (<u>Id.</u> at 11.)  Baker explained at the
evidentiary hearing that he disfavored young student jurors. (Tr.
Evidentiary Hr'g 11, 13.)  He testified that when selecting jurors,
he looks at "[w]ho else is on the panel[;] [w]ho's coming up next."
(<u>Id.</u> at 7.)  But when asked why he accepted Garibay, the teacher,
as an alternative, Baker candidly admitted, "I would have guessed I
would have struck her." (<u>Id.</u> at 78.)  "There may be other reasons
I didn't." (<u>Id.</u> at 79.)  "I don't recall why I did [not challenge
the teacher as an alternate]." (<u>Id.</u>)

Respondent theorizes that because Baker only had one challenge
to use on the possible alternates he "had to decide which of these
[first two potential alternate] jurors he favored more." (Post-
Hr'g Opening Brief 11.)  The prosecutor "chose [the teacher], whose
biographical information indicated more life experience than [the
student]." (<u>Id.</u>)  "Had Mr. Baker struck Ms. Garibay he would have
necessarily been selecting the next option, Mr. Noris, because Mr.
Baker only had one challenge to exercise." (Post-Evidentiary Hr'g
Reply Br. 13.)

Petitioner counters that the "more plausible [explanation] is
the simple observation that the 'teacher/social worker' criterion
had no bearing at all on [Baker's] selection conduct." (Pet'r's
Post-Hr'g Br. 6.)  Love explains, "It is incongruent that Baker
would pass over a professed member of the target occupation and
then remove a non-member, faced with a significant chance the final
alternate would also be a teacher." (<u>Id.</u>)

Nonetheless, the Respondent's argument makes sense.  It is,
however, not what Baker described under oath.  The prosecutor
offered no explanation why he did not challenge the teacher as an

alternate.   Baker could recall no reason.   Respondent's speculation
is no substitute for testimony as to Baker's actual reasons.   See
Paulino II, 542 F.3d at 700.

Love observes that Baker was not consistent because during
jury selection, he excused a juror based on occupation before he
excused a juror based on youth, and during alternate selection, he
used his only strike to excuse a juror based on youth rather than
excusing a juror based on occupation.   (Opp'n Mot. Strike &
Surreply 7.)   Petitioner claims that this shows that the "'rule of
thumb' was not being applied[.]"   (Id.)

Baker described the general principles he applies to voir dire
and claimed that he applied those principals in Love's case.   (Tr.
Evidentiary Hr'g 76.)   He agreed that it was fair to say that
Love's case "was not [his] typical voir dire style."   (Id. at 20.)
He spent less time than usual on voir dire; he had less time to
plan for trial; and he was essentially engaged in "damage control."
(Id. at 44; see also id. at 62.)   When asked whether his handling
of Love's case was consistent with how he would normally conduct a
case, Baker answered, "Oh, no."   (Id. at 44-45.)

At the evidentiary hearing, the prosecutor explained that
occupation is just one of many factors that he considers.   (Id. at
7-10, 26, 59, 61-62, 71-74.)   Conversely, when he spoke of his
strike of McGee, he stated that occupation alone was sufficient to
strike her.   (Id. at 81.)

Baker was present when alternate juror Garibay disclosed she
was a teacher.   He asked her no questions.   He had the opportunity
to strike her but chose not to.   This is not consistent with the
prosecutor's explanation that one's occupation as a teacher was

43

sufficient for him to exercise a strike.  Baker does not recall why he accepted Garibay as an alternate.  The uneven application of his general principles to the selection of an alternate is additional evidence of pretext.  The prosecutor's willingness to apply his general principles and personal preferences categorically to McGee, but use them sparingly when considering others, is evidence of a race-based motivation.  McCain, 217 F.3d at 1221.

### d.   Other Factors

### i.   Questioning of Jurors

On occasion, the manner in which the prosecutor questions potential jurors will aid the Court's determination of whether the race-neutral explanation was pretextual.

In Miller-El, 545 U.S. at 255, the Court compared the prosecutor's questioning of black and nonblack prospective jurors. It concluded that disparate questioning of black jurors with a script designed to elicit some hesitation to consider the death penalty was evidence of purposeful racial discrimination.  Whether a potential juror is questioned may also be probative.  See United States v. Collins, 551 F.3d at 922; United States v. Esparza-Gonzalez, 422 F.3d 897, 904-05 (9th Cir. 2005); Fernandez v. Roe, 286 F.3d 1073, 1079 (9th Cir. 2002).

In Collins, the Ninth Circuit noted that "the prosecutor did not pursue further questioning before striking the only remaining African-American panel member."  United States v. Collins, 551 F.3d at 922 (citing United States v. Esparza-Gonzalez, 422 F.3d at 905). The problem is that the prosecutor may have "very little hard information to base this decision [to strike a juror] on."  Id. (quoting Esparza-Gonzalez, 422 F.3d at 905).  "Although the

prosecutor has no obligation to question all potential jurors, his failure to do so prior to effectively removing a juror of a cognizable group . . . may contribute to a suspicion that this juror was removed on the basis of race." Esparza-Gonzalez, 422 F.3d at 905; see also Fernandez v. Roe, 286 F.3d at 1079 (noting that "the prosecutor failed to engage in meaningful questioning of any of the minority jurors[]").

Respondent argues that "Mr. Baker treated the jurors identically during questioning." (Post-Evidentiary Hr'g Opening Br. 12; see also Post-Evidentiary Hr'g Reply Br. 8.) Baker asked questions of the panel as a whole and asked only one direct question to a juror and asked no questions regarding any juror's biographical information. (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 364-66.) He explained that voir dire was unusual because Kowalski had already questioned most of the jurors, and he did not feel comfortable questioning them again. (Tr. Evidentiary Hr'g 19-20.) His recollection is not entirely correct. As Petitioner correctly points out, six of the twelve seated jurors and the alternate were questioned during the second day of jury selection. (Pet'r's Post-Hr'g Br. 9; see J. Mot. Copy Tr. State Proceedings, Attach. #2 Tr. 348-63.)

Petitioner asserts that Baker's assertion that he was pressed for time or had an insufficient opportunity to question jurors fails because he was given twenty minutes for questioning but only asked five questions. (Pet'r's Post-Hr'g Br. 8.)

Baker described the difficulties he encountered. (Tr. Evidentiary Hr'g 20.) He didn't have an opportunity to talk to the prosecutor who conducted the first day of jury selection. (Id.)

He hadn't prepared an opening statement; he hadn't read the prison incident reports.  (Id.)  "[I]t wasn't a typical trial.  It was kind of a mess."  (Id.)  Baker's entrance into this case midway through voir dire and one hour before giving an opening statement was an unusual circumstance.  Nonetheless, he knew McGee's occupation, and he knew that juror ten was a teacher; juror eight was a teacher's aide; and juror four was an instructional assistant.  Baker was an experienced prosecutor; he was familiar with Batson and understood the significance of striking the only African-American from the jury.  (Tr. Evidentiary Hr'g 2-4.)  Under these circumstances, his failure to question McGee is suspect.

### ii. Pattern of Strikes

Petitioner contends that the prosecutor's use of his first strike to excuse the only African-American in the jury box is evidence of pretext.  (Pet'r's Post-Hr'g Br. 4.)  Love argues that the prosecutor challenged McGee before Ramirez, whom Love feels was a better candidate for a strike by the prosecutor.  (Id. at 4-5.)  Additionally, if Baker disfavored "youthful inexperience" he would have stricken Duron, a single, childless, recent community college graduate, before he struck McGee.  (Id. at 18.)

Respondent acknowledges that McGee was the first juror challenged by Baker, but this was followed by challenges to the worker at the Social Security office, a student, and a tow operator.  (Post-Evidentiary Hr'g Opening Br. 3.)  Respondent speculates that Baker used his first strike against McGee because she was the first juror in the jury box.  (Post-Evidentiary Hr'g Reply Br. 8.)  And "there is no requirement that the prosecution excuse jurors in the order that [he] disfavors them."  (Id.)

1     The order in which jurors are stricken may assist in deciding

2  whether a challenged strike was based on racial discrimination.

3  See United States v. Chinchilla, 874 F.2d at 698 (noting that

4  government used its first peremptory challenge to strike the only

5  Hispanic).  But that analysis is not particularly useful here

6  because there was only one African-American on the jury, and she

7  was the first person seated in the jury box.  There is not enough

8  evidence for the Court to determine whether striking McGee first is

9  evidence of pretext or simply the result of her being in the first

10 seat.  Thus, the Court affords this argument little weight.

11                        **III. CONCLUSION**

12     Baker's categorical explanation for striking McGee  --

13 teachers and social workers don't sit on the jury -- was not

14 consistently applied.  He challenged McGee but permitted non-

15 African-Americans to serve on the jury.  Alternatively, if being a

16 teacher or social worker was only one of many factors the

17 prosecutor generally considered, Baker was unable to articulate any

18 additional reasons he had for challenging McGee.  He did not

19 identify any of his guidelines as the actual reason for challenging

20 her or not challenging others.  The prosecutor simply did not

21 recall what he had done five and one-half years earlier.  In Love's

22 case, additional reasons did not come from Baker, but from

23 Respondent's counsel.  Her speculation is not entitled to any

24 weight.  The evidence indicates that the peremptory strike was

25 racially motivated.

26     On July 21, 2003, Baker struck the only African-American

27 seated on the jury to try this African-American defendant.  Love

28 has proven, by a preponderance of the evidence, that the prosecutor

did not strike McGee from the jury simply because she was an

eligibility worker.  The circumstances of that peremptory strike,

Baker's inability to articulate a credible explanation for the

strike, and a comparative analysis of McGee and jurors who were

permitted to serve are sufficient to conclude that Baker used a

peremptory challenge to eliminate McGee from the jury because she

was African-American.  The prosecutor's strike violated the Equal

Protection Clause as described in <u>Batson v. Kentucky</u>, 476 U.S. 79.

The Court recommends that unless Love is retried within a

reasonable period to be set by the district court, his Petition for

Writ of Habeas Corpus be **GRANTED**.

    This Report and Recommendation will be submitted to United

States District Court Judge William Q. Hayes, pursuant to the

provisions of 28 U.S.C. § 636(b)(1).  Any party may file written

objections with the district court and serve a copy on all parties

on or before <u>December 18, 2009</u>.  The document should be captioned

"Objections to Report and Recommendation."  Any reply to the

objections shall be served and filed on or before January 8, 2010.

The parties are advised that failure to file objections within the

specified time may waive the right to appeal the district court's

order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1157 (9th Cir. 1991).

    **IT IS SO ORDERED.**


Dated: November 30, 2009         _Ruben Brooks_
                                 Ruben B. Brooks, Magistrate Judge
                                 United States District Court

cc:
Judge Hayes
All parties of record